May it please the court, my name is Nancy Bergeson and I represent Mr. Gunnar Crapser and I'd like to reserve a couple of minutes for rebuttal if I might. The question before the court essentially boils down to whether or not the encounter between Gunnar Crapser and law enforcement about three years ago was a consensual encounter. Mr. Crapser says that it was not. The test is undisputed. It has been referenced by this court a number of times. It is an objective one. And it requires a contextual analysis that is under the totality of the circumstances. Would the police conduct have communicated to a reasonable person that that person was not at liberty to ignore the police presence and go about his or her business? In this case, the interaction between Mr. Crapser and police did not communicate to him that he was clearly not at liberty to ignore the police presence. Suppose he wasn't free to go about his business and he was subject of a ferry stop to determine whether he was the Gunnar Crapser that they were looking for. Well, Your Honor, the court, neither the police nor the government nor the court found that either advocated for or found that facts existed to support a ferry stop. There is, as this court is undoubtedly aware, not a case that has applied and legitimized a ferry stop at a residence. And, in fact, there is some caution against that in the case of Washington. Counsel, as I understood your colloquy with the district court, though, I don't remember if it was you or your predecessor in interest, but the court was asking whether there was any challenge to the existence of reasonable suspicion to believe that your client might be involved in drug production because of the pressure cooker and apparently other facts which aren't detailed in that record. And I understood your position below to be simply, well, it didn't matter if they had reasonable suspicion or not, they can't make a ferry stop on the threshold of a home in this manner, and that that was where, that all your eggs were in that basket. Did I misunderstand that colloquy? Your Honor, I don't think that that was the position. I was the advocate. I was trial counsel, and we ran the motion. There was quite a bit of briefing before the court, but we strongly contested the notion of reasonable suspicion for a couple of reasons. First of all, we advocated and took the position that there was not a warrant for our client and don't believe that that would be a basis for reasonable suspicion in any event. But secondly, the information coming from Mr. Barrett, who was the individual who was stopped earlier in the morning, was completely, it was a singular piece of information. This pressure cooker that I have in my trunk belongs to Gunner Crapser. Gunner Crapser is staying at the Econolodge in room 114. His girlfriend, Summer Tuogere, is renting that room. That's the extent of the information that came from Mr. Barrett. What was the, what was, there was a warrant for somebody's arrest, a person by this name, and what was the nature of the warrant? I was having difficulty determining that from the, from the record. It requires a pretty careful scrutiny of the record, but essentially what happened was that there was a do not confuse warrant. No, no, does the warrant identify what he was looking, why they were looking for him? The Gunner Crapser? Whichever Gunner Crapser it was, they were looking for that person. The warrant actually, they were not looking for Gunner Crapser. They were looking, the warrant was for, based on what Mr. Barrett said, there is a Gunner Crapser. He owns this pressure cooker. That's the only identification of Gunner Crapser that came to the police. Then they went and they ran a warrant. They found a warrant for a Mr. Stover that was a do not confuse with Gunner Crapser. Okay, but what was the nature of that crime of Stover? It was, that was a probation violation warrant. And it's at the, at excerpt of the record, generally 49-50-51. And it was a, it was apparently some sort of a probation violation. There was evidently this person, Stover, had used the name Gunner Crapser before. That's why. It only, does it only say it was a probation violation without identifying the nature of the violation or the underlying offense? There's no additional information in the record whatsoever. And it's a little vague. All right, well that answers his question. That was what we wanted to know. It was vague to you too, Ben. Yes, but what was clear, what was abundantly clear is that police had available to them various mechanisms through LADS and NCIC to check and obtain a description of both of these individuals. And, in fact, they identified both of these individuals at the motion. Gunner Crapser, very different from Mr. Stover. Gunner Crapser, brown hair. He had been described by Mr. Barrett, having brown hair, being 5'6 and 160 pounds. Distinctive. So, the basis, the idea that the warrant, checking this warrant and justifying it as a, as a Terry stop, I think is unfounded. Just out of curiosity, are there a lot of people who use the name Gunner Crapser in Argo? It said, seriously, it said don't confuse him with the other Gunner Crapses, plural. I hope not, Your Honor. This was a situation, apparently, where this individual, Stover, had used the name Gunner Crapser. I think that's all that it amounted to when he had been previously stopped. And so it was a do not confuse with the real Gunner Crapser who was my client. But in any event, police certainly had available to them mechanisms to sort that out. And from the inception of their contact with Mr. Crapser could easily have determined this is not the guy we're looking for. He has brown hair. He's 5'6. He's not the guy. And as soon as my client said, I am Gunner Crapser, I do not have any warrants outstanding for me, any kind of an idea that this person could have been wanted by the law would have dissipated. So that is not a legitimate basis. So then to the issue here, the guts of the issue is when these officers came to the econolodge, all four of them at the front door, all three of them completely uniformed and armed, visibly, with their weapons displayed, and told as they knocked at the door, no response. And then the window opens, and Ms. Terwilliger looks out, and the officer says, I asked her to open the door so we could speak to her. They come out. And then, importantly, they take Mr. Crapser to a distinct location to check into this warrant. And they tell him so. They take Ms. Terwilliger to another location. They separate the two of them. They are separated by as much as 25 or 30 feet. Ms. Terwilliger is like 8 feet from the door. So they walk them apart. They tell Mr. Crapser, we're going to check into your warrant. And yet the government advocates and the trial court found that that is a consensual encounter. And it's our very strong position that that is simply not a consensual encounter. Do you have about a minute and a half? Do you want to save it for rebuttal?  Thank you. Thank you. Thank you, Your Honor. May it please the Court, Ms. Bergeson, Frank Noonan and I'm here this morning to argue the case on behalf of the government. And what I would like to do is simply briefly review the facts of this case and perhaps pay some particular attention to the trilogy of this Court's cases that I think control, including Washington, Cormier, and the Ororo-Hage case. I may not be pronouncing the name of that last one correctly. I'm not sure. And to point out before starting that analysis, Your Honors, if I might, that on both of the issues before the Court, that is, whether the encounter is consensual and whether the subsequent statements and consent to search are voluntary are controlled by the clearly erroneous standard. And I think whatever one might say of Judge Brown's findings, that is, my position is, of course, that the findings are completely supported by the conclusions. But even if this Court were to have some question about any of those facts, I don't think that it can be said that her findings are clearly erroneous, both with respect to the issue of the consensual encounter and then secondly with respect to the issue of the voluntariness of the consent. And then where I would like to start, if I might, Your Honors, is just with a very brief overview of the facts. On the morning in question, about 11 o'clock, Officer Shanks has an encounter with a person driving an automobile, finds in that automobile a pressure cooker. A counter, no criminal activity, traffic encounter? A traffic encounter, Your Honor, yes. And the legitimacy of that I don't think was before the Court. But an ordinary, a pretty ordinary apparently sort of stop, with Mr. Barrett being somewhat cordial and talking with Officer Shanks, telling him that the pressure cooker belonged to a person he identified as Gunner Crapser. He has an ordinary encounter with somebody in a car who has a traffic offense? Yes, Your Honor. And in the car he finds the person? In the car is a pressure cooker. And he asks whose pressure cooker is it? Well, Your Honor, I'm not sure whether he asked or Mr. Barrett volunteered. Mr. Barrett said, by the way, this pressure cooker belongs to the notorious Gunner Crapser? To one of the Gunner Crapsers. One of the Gunner Crapsers. And further, Your Honors, if I might, that Gunner Crapser was at the O'Connell Lodge. That Gunner Crapser was there with a person described by Mr. Barrett as a dancer named Summer. That doesn't sound very suspicious. The man's at a motel with a dancer. It's not the vice squad. No, but certainly the information that it was a pressure cooker and that Mr. Crapser was involved in cooking methamphetamine. Wait a minute. Where did we get the cooking methamphetamine? That comes from Mr. Barrett. What did he say? He said that he believed he might be cooking methamphetamine, something to that effect, Your Honor. I think I quoted it in the brief. But clearly Mr. Barrett advised Officer Shanks of his suspicions that Mr. Crapser was there and was involved in methamphetamine and was with Ms. Summer. I don't think he used the last name. So then Officer Shanks discovers the warrant for Mr. Jordan that is a probation violator warrant indicating don't confuse with Gunner Crapser. And I think there was some testimony from the officer that perhaps Mr. Jordan had used Gunner Crapser and maybe Mr. Crapser had used the name Jordan. But in any event, the warrant did indicate no confusion. The next thing in the chronology that happens is Officer Shanks summons some aid from some of his colleagues. They go to the motel. One of the officers is out back, but that officer could not have been seen from inside  As I understand it, there was testimony that they had two purposes in going. One was to determine whether this was the individual with the probation violation and the other was to ask questions about drug manufacture because of the Yes, and I think Officer Shanks was pretty candid about that. He did not have a warrant. He wanted to go and he wanted to investigate, and I think he himself used the knock and talk description that this Court has used, to investigate based upon what he had been told about the potential for some methamphetamine production. So when he gets there, and there are three officers outside, and admittedly they're in uniform and they do have firearms on their person, the normal sorts of accoutrements that a law enforcement person would have, Officer Shanks knocks on the door. And for a brief period of time there's no response. And then Ms. Twilliger opens the curtains and looks out. And Officer Shanks is able to communicate through the open window in the curtain. Can you come outside? We want to talk with you. She nods, and then the curtains close again. And then I think there's sort of a telling moment, Your Honors, when approximately two minutes goes by, according to both Officer Shanks and Officer Galloway, when they say they can hear movement inside, but they don't do anything. In other words, they don't holler. They don't say, Hey, come out. They don't decide that they've got some exigent circumstances and begin pounding or knocking down doors. They basically wait for them. And in about two minutes, both the defendant, Mr. Crafter, and Summer Twilliger, come out of the motel. It's about 11 o'clock in the morning, I believe, and it is a public area. There's a sign posted, as Ms. Bergeson points out, that parking is for motel guests only. But this is sort of an L-shaped parking lot. And as Officer Shanks testified, open to the public. Anyone can come and go from the motel room. Distinguishing this, I think, from both the Washington and Ojigwe cases, where the encounters occurred in an area that was shielded from public view. Then they have some conversation, and one of the officers, Officer Galloway, goes to his car. He runs some warrants checks and some descriptors and comes back and indicates to Officer Pfeiffer, who is with the defendant, this is not the right guy, essentially. There are no wants or warrants out. But during that interim, the defendant had produced the syringe, which Officer Galloway testified he was able to identify as typical for narcotics users, and that the substance in the syringe, in his view, based upon his experience, was methamphetamine. One of the things I'd like to do is to talk a little bit about the time sequence here, in terms of the duration and the intensity of this contact. If Officer Shanks' testimony is believed, then it was pretty much uncontroverted. From the time he knocks on the door until the officers actually have probable cause to make the arrest, as Judge Brown finds, there's no more than seven minutes. The knock on the door is followed by a two-minute pause, and then Officer Galloway, in his direct testimony in the trial court, says, from the time you come out until the time, and he goes with Ms. Twilliger and talks to her, then goes back to where Mr. Crapser is. He said that was a total of five minutes. So adding the two, it's a total, it's a seven-minute-type confrontation. And I'm going to run out of time here before too long. So what I'd like to do is just sort of generically, if I can, distinguish Washington and Ojigwe. I mean, I think in both of those cases, Your Honors, the findings that this Court made regarding the activities of the INS people in the Ojigwe base and the folks in the other cases, that there was an authoritative display of force. From the INS officer in Ojigwe, putting his hand on his hip, he said it wasn't to demonstrate he had a firearm. And I think that Judge Reinhart said, no, that's probably not the case. That probably was done to indicate at least that he had his hand on his hip where his firearm would have been. Telling the defendant in that case, we don't need a warrant, when the defendant at the threshold of his apartment asked, do you have a warrant? And certainly in the Washington case, the immediate advice to the defendant was, we can arrest you. We can arrest you at any time. The defendant wants the door to his apartment closed. They say, no, we're uncomfortable with that. They essentially enter the apartment without consent. I am going to run out of time, but what I would ask the Court to do is to distinguish those kinds of cases where there is what this Court found to be some rather oppressive, rather authoritative display of force and authority by police to a case like this, where I think what the officers did was perfectly reasonable. I don't think they did nothing to demonstrate their authority or force, and I think Judge Brown's factual findings in that regard cannot be said to be clearly erroneous. And I think they support the view that this is the kind of encounter which this Court and the Cormier and other cases has characterized as legitimate knock-and-talk and that the consent was voluntary, I think, in going through the factors this Court enunciated in the Chalabu case. I'm sorry, Your Honor. Your Honor, I think I can probably find it. Page 24 and 25, that's what you said you think. Your Honor, I'm looking at 24 and 25. I don't see it there. Have you found anything at all about the man in the car saying anything about methamphetamine? Your Honor, I am quite sure that is in the record. That's my recollection now. Your Honor, I will have to research it. I'm sorry. I remember very distinctly there was that evidence in the trial court, and if I'm mistaken, I am. If there isn't, all there was then was if they stopped the car, which had a pressure cooker. The man driving the car in the traffic defense said, it's Gunner Crapser's pressure cooker, and Gunner Crapser is staying at a hotel with a dancer. Yes. And that was all they had other than there was a warrant for Gunner Crapser. Well, yes, there was indeed a warrant for someone named Gunner Crapser. Okay. So they then had a right to go to see if they had the right to Gunner Crapser, if the man at the motel, to investigate whether he was the object of the warrant. But without any mention of methamphetamine, what is the basis for any carry stop for any purpose? Your Honor, assuming, and if I was mistaken, I certainly apologize. Let's assume that there is. Let's assume that there is no mention of methamphetamine. Then my position would be, as Judge Craver pointed out, that they also had the right to go there to investigate whether or not there was an arrest warrant. Yes. And they did that relatively expeditiously. No question. And then the other thing that I would urge is that unless this Court were to find that the factual findings of Judge Brown were incorrect regarding the consensual nature of this encounter, and under this Court's analysis in Cormier, they wouldn't even need reasonable suspicion to conduct a knock-and-talk. I mean, my view of the knock-and-talk analysis in Cormier and this Court in related cases is that the police or anyone else can go to a residence. They don't go in. They knock on the door, and they ask some questions. And that's okay unless that encounter escalates beyond what is legitimized as a knock-and-talk because of a show of authority or because of use of force or some other untoward activity by the police which just doesn't exist there. So my position would be, absent anything else in this case, if the police were going by them and said, well, let's go see if anybody's putting methamphetamine there, the things they did here would have been okay because they didn't use any display of force. They weren't. They were really – it was a relatively – Well, you don't even think it's a Terry stuff? Even – I think, Your Honor, even Terry has historically required some degree of suspicion. Well, there was suspicion that he had a – it was a person they were looking for with a warrant. Yeah, and I'm sort of trying to bifurcate those two issues. That's one basis. Now, if in addition to the no methamphetamine, we were to back out of the equation here, the arrest warrant, then I would still submit that what these officers did, that the trial court would not have found and this court should not find objectionable because they didn't do anything wrong. If there's a Terry stuff for – because they wanted to find out whether he was the right kind of craftsman. Yes. I'm not questioning the legitimacy of the Terry stuff for that purpose. If there was a Terry stuff for that purpose, then the question is what is proper to do during Terry stuff? I'm sorry, Your Honor. Maybe I was missing – yes. I don't want to give away the Terry stuff issue either. Thank you for helping me. But I – assuming there's a Terry stuff, then I think there – this is a very brief encounter, and the court will recall from the record that one of the officers stays with Mr. Craftsman. The other officer goes to the car. That can't be longer than five minutes because we know that total seven, two were spent in the motel room, and within five minutes or less, he's back saying, we've done it. Is it the government's position that there was no detention at all until the syringe came out? Yes. There was no detention. Yes. It was a consensual encounter, Your Honor. A knock and talk. It's a knock and talk consent issue. Thank you very much, Your Honor. Thank you. There's no evidence at all in the record that Mr. Barrett gave any information that Mr. Craftsman was cooking that amphetamine. Now, in relation to this issue of the Terry stuff to clear up the warrant, the record shows that the police did not believe they had a basis to detain Mr. Craftsman. They're very clear about that. It's found at, I think, ER 60. They were also very clear that what they were doing was conducting a knock and talk, that they wanted a way to try to get in and search and get consent and search. So the government has not advocated, has never taken a position that there was reasonable suspicion, based on any theory, based on checking a warrant or any theory, to go to this hotel and stop and conduct a Terry stop of Mr. Craftsman. The trial court never found that. The government hasn't advocated that on appeal. And, in fact, there is none. There is no basis for the police to go to a residence, pull a person out, and say, I think we have a warrant for you. We want to run a warrants check. And the theory of Terry is that you have, if you have a reasonable suspicion that If they had met Mr. Craftsman on the street, could they have stopped him and said, knowing that he was Gunner Craftsman, could they have stopped him and said, there's a warrant for Gunner Craftsman, are you the same Gunner Craftsman? May we see your identification? They, I think that it presents a bit of a different situation, but still I think you're in a realm where you have to determine whether it's a voluntary encounter or a reasonable suspicion, as Terry stopped. I think that was a yes or no question, and I'd like to hear a yes or no answer, because I have the same curiosity that Judge Reinhart does. I think no. I think no, because I think what the warrant issue is this. So if we had a warrant for a Nancy Bergeson, you know, the police couldn't stop you on the street and ask if you're the same one in the warrant? I don't believe that you can, because I think the issue is whether or not a Terry stop concerns whether or not criminal activity is afoot. Can the police determine if there's a warrant outstanding for me, independent of detaining me? They can. Gunner Craftster didn't offer anything that would have enlightened that inquiry. All the police had to do was take a look at him. He walks out the door. You're not Gunner Craftster. You're not Ron Stover, James Stover, who we're looking for. The police have, it's not a question of my answer about whether or not a viable warrant is existing for me. And so it is not a basis for a Terry stop, and I think the matter's complicated here where you go to a residence and extract somebody in order to conduct essentially detention. And that's really what it amounts to here. They take this person. Let's check and see if you have a warrant. That person's not walking away. It's what a reasonable person would believe under the circumstances. That person's thinking, you know, I might go to jail. I'm not moving. And I think there's a very recent decision. I think it's McWheeney that was offered by Judge Goodwin. It does, by analogy, the same sort of thing, looks at the objective circumstances, what a reasonable person would think under the circumstances. And here, Mr. Craftster was detained. And there was no basis for his detention. And to the extent the Court ---- Kennedy. When did the detention start, in your argument? In my view, the detention started when he produced the syringe, and that's what the trial court found. From that point on, I think there is reasonable suspicion. But until then, he was not under any compulsion. He was just a citizen engaging in a knock-and-chat. No. I misstated that. I'm sorry. Strike that. The detention started immediately. The trial court found that the detention started ---- Well, you mean immediately when the knock-and-talk transaction began? Absolutely. That's when it was ---- Based on the number of officers. It was a detention from then on. Yes. And you say it was illegal detention because it wasn't a serious situation. Yes. Exactly. Exactly. I'm sorry. I misspoke. I was relating to what the Court found. I'm way over. Thank you. Well, if the case is public, you could have used a little bit more time to clear that up. Thank you. Thank you. Don't forget to give it back to me. Thank you. The case just argued will be submitted.
judges: Goodwin, Reinhardt, Graber